UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. _____

BANKUNITED, INC.

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendant.
_____/

## COMPLAINT

BankUnited Inc., ("Plaintiff") hereby brings this suit for a refund of federal income taxes that were erroneously collected and illegally retained by Defendant, the United States of America ("Defendant") and, as the basis for this complaint (the "Complaint"), alleges as follows:

### NATURE OF THIS DISPUTE

1. This action arises under the Internal Revenue Code of 1986, as amended and codified in Title 26 of the United States Code (the "Code"), for the recovery of federal income taxes erroneously collected and illegally retained by Defendant for Plaintiff's 2019 taxable year (the "2019 Tax Year").

2. Plaintiff seeks recovery of $39,797,526 of federal income taxes paid by Plaintiff for the 2019 Tax Year, plus overpayment interest on the amounts to be refunded, or such greater amount as is legally refundable.

### THE PARTIES

3. Plaintiff is the common parent of an affiliated group of corporations that file a consolidated tax return. BankUnited N.A ("BankUnited"), a wholly-owned subsidiary of

Plaintiff, is a national banking association organized and operating pursuant to the National Bank Act, 12 U.S.C. § 21, et seq., with its principal place of business in Miami Lakes, Florida. Plaintiff's Federal Employer Identification Number is ██████2450 and its mailing address for correspondence with the Internal Revenue Service ("IRS") is 7815 NW 148 Street, Miami Lakes, Florida, 33016.

4. The Defendant is the United States of America.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1346(a)(1).

6. Plaintiff timely filed its corporate U.S. income tax return (IRS Form 1120) for the 2019 Tax Year on or about October 14, 2020.

7. Prior to the filing of this Complaint, Plaintiff timely paid all of its U.S. federal income tax liabilities for the 2019 tax year. *See Flora v. United States*, 362 U.S. 145 (1960).

8. Plaintiff has complied with the statutory requirements of exhausting its administrative remedies prior to filing this lawsuit. *See* 26 U.S.C. §§ 6532, 7422. On or about March 30, 2022, Plaintiff timely filed an amended 2019 tax return seeking a refund of taxes paid (the "Refund Claim"). The IRS has not paid any refund or otherwise acted on the Refund Claim. More than six months have expired since Plaintiff filed the Refund Claim. 26 U.S.C. § 6532(a)(1).

9. Venue for this action properly lies in this Court pursuant to 28 U.S.C. § 1402(a)(2).

## FACTUAL ALLEGATIONS

10. From 2009 to 2014, Plaintiff paid taxes on $1.682 billion of "phantom" income—i.e., income that Plaintiff reported on its U.S. federal income tax returns even though it earned no actual economic income. This phantom income was related to BankUnited's acquisition of a failed bank, BankUnited, F.S.B. ("BUFSB"), in 2009. BankUnited

acquired tax basis in a capitalized asset ("the Section 597[1] Basis," defined below) as a result of the acquisition of BUFSB, such that Plaintiff is entitled by operation of law to recognize a loss with respect to that asset in the 2019 Tax Year.

*The 2009 BUFSB Acquisition*

11. On May 21, 2009, BankUnited acquired the assets and liabilities of BUFSB in an FDIC-assisted purchase and assumption transaction (the "BUFSB Acquisition").

12. After a bank has failed (or been declared insolvent), it is placed into receivership with the Federal Deposit Insurance Corporation ("FDIC"), which can arrange for another bank to purchase the assets of the failed bank and assume its liabilities in a purchase and assumption transaction.

13. In May 2009, BUFSB failed and was placed into FDIC receivership. The FDIC sought to find another bank to acquire BUFSB's assets. It was in this context that BankUnited made the BUFSB Acquisition.

14. Congress and Treasury have created specific and detailed rules that set forth the tax effects of FDIC-assisted purchase and assumption acquisitions, including the BUFSB Acquisition. These rules are set forth in section 597 of the Code and in the Treasury Regulations promulgated under that statute (the "Section 597 Regulations").

15. BankUnited strictly followed these rules, which resulted in Plaintiff reporting taxable income of $1.682 billion even though Plaintiff had not earned income, in economic terms, of that amount.

---

[1] Unless otherwise indicated, references to "section" herein are to the Code.

16. Under the Section 597 Regulations, BankUnited was treated as receiving assets of BUFSB (the "BUFSB Assets") with a fair market value equal to $14.448 billion. These assets included:

    (a) $3.317 billion of cash

    (b) $1.158 billion of securities

    (c) A portfolio of residential and commercial real estate loans (the "BUFSB Loans") with a fair market value equal to $8.026 billion

    (d) 100 percent of the common stock of a subsidiary real estate investment trust, ("BU REIT"), which held a portfolio of residential real estate loans (the "BU REIT Loans") with a fair market value equal to $1.947 billion.

17. In addition to acquiring the BUFSB Assets, BankUnited also reported the assumption of $12.766 billion of BUFSB's liabilities. Under the Section 597 Regulations, the value of these liabilities was considered the purchase price BankUnited paid for the BUFSB Assets (the "Purchase Price").

*BankUnited's Deemed Ownership of the BU REIT Loans*

18. The FDIC often encourages buyers to acquire as many of a failed bank's assets as possible by entering into certain loss-sharing agreements with the buyer. Under these agreements, the FDIC and buyer agree that the FDIC will bear a portion of the losses associated with loans covered by the agreement.

19. Here, BankUnited and the FDIC entered into two loss-sharing agreements under which BankUnited was the beneficiary (the "FDIC Loss Guarantees"). These agreements covered both the BUFSB Loans and the BU REIT Loans.

20. One of the Section 597 Regulations, Treas. Reg. § 1.597-3(a) (2003), stated "[f]or all income tax purposes, an Institution is treated as the owner of all assets covered by a Loss Guarantee . . . regardless of whether Agency (or a Controlled Entity) otherwise would be treated as the owner under general principles of income taxation."

21. Thus, under the Section 597 Regulations, BankUnited was *deemed* to have acquired the $1.947 billion of BU REIT Loans owned by BU REIT, in addition to the $8.026 billion of BUFSB Loans that it *actually* acquired, because the BU REIT Loans were covered by the FDIC Loss Guarantees.

*The Phantom Income*

22. When one company acquires the assets of another, the acquiring company typically pays a lump sum "purchase price" for all of the assets acquired in the transaction.

23. For purposes of determining taxable income and tax basis, however, the company needs to know how much of that lump sum is attributable to each acquired asset. Accordingly, the Code and Treasury Regulations provide detailed rules for how the purchase price is allocated among the acquired assets. Tax basis is an asset that a company can use to offset income. For example, when stock is sold, gain is only recognized in an amount equal to the sale price over the tax basis.

24. In this case, because the BUFSB Acquisition was governed by section 597, BankUnited applied the residual waterfall methodology mandated by the Section 597 Regulations to allocate its Purchase Price to the BUFSB Assets.

25. First, BankUnited was required to categorize the BUFSB Assets into seven "classes" of assets in order of liquidity:

   Class I consists of cash and cash-equivalents;

    Class II consists of actively traded property;

    Class III consists of certain receivables;

    Class IV consists of inventory;

    Class V consists of all assets other than Class I, II, III, IV, VI, VII assets;

    Class VI consists of section 197 intangibles; and

    Class VII consists of goodwill and going concern.

26. As part of this classification, the Section 597 Regulations require that any assets subject to an FDIC loss guaranty be placed into Class II.

27. Accordingly, BankUnited classified the BUFSB Assets as follows:

  (a)  The acquired cash was categorized as a Class I asset.

  (b)  The acquired securities were categorized as Class II assets.

  (c)  The BUFSB Loans, which BankUnited actually acquired and were subject to the FDIC Loss Guarantees, were categorized as Class II assets.

  (d)  The BU REIT Loans, which BankUnited was deemed to have acquired and which were also subject to the FDIC Loss Guarantees, were likewise categorized as Class II assets.

  (e)  The common stock of BU REIT was categorized as a Class V asset.

28. After the BUFSB Assets were placed into their respective classes, the Section 597 Regulations next required BankUnited to allocate its Purchase Price to each class of assets in descending order (i.e., first allocating purchase price to the Class I assets up to their fair market value, then the same for the Class II assets, then Class III, etc., until all the purchase price has been allocated).

29. As part of this allocation process, the Section 597 Regulations require that all Class I and Class II assets be assigned tax bases equal to their fair market value. This is required even

6

        if the fair market value of the Class I and Class II assets is greater than the purchase price available to allocate.

30. Such situation creates an economic mismatch, however—i.e., the acquiring bank takes a basis in assets that exceeds the purchase price it paid for them. The Section 597 Regulations account for this mismatch by requiring the acquiring bank to recognize an amount of gain equal to the excess basis allocated to the Class I and Class II assets over the total purchase price it paid ("Section 597 Gain"). This Section 597 Gain is taken into income by the acquiring bank ratably over a six-year period.

31. Applying the Section 597 Regulations to BankUnited's purchase price allocation resulted in BankUnited allocating:

    (a) $3.317 billion of basis to the Class I assets (i.e. the cash BankUnited acquired)

    (b) $11.131 billion of basis to the Class II assets (i.e. the BUFSB Loans and securities that BankUnited acquired, together with the BU REIT Loans that BankUnited was deemed to have acquired)

    (c) $0 basis to the Class V asset (i.e. the BU REIT stock that BankUnited acquired).

32. Because the fair market value of the Class I and Class II assets ($14.448 billion) exceeded the Purchase Price paid by BankUnited ($12.766 billion), BankUnited recognized $1.682 billion of Section 597 Gain, spread over the 6-year period from 2009-2014.

33. The $1.682 billion of Section 597 Gain that BankUnited recognized was a result of the Section 597 Regulations' requirement that BankUnited treat itself as the *deemed* owner of the BU REIT Loans and include such loans as Class II assets. If BankUnited had not included the fair market value of the BU REIT Loans ($1.947 billion) in its Class II

assets, BankUnited's purchase price ($12.766 billion) would have been greater than the Class I and Class II assets it acquired ($12.501 billion) and BankUnited would not have recognized any Section 597 Gain.

34. Moreover, because BankUnited did not have legal title to the BU REIT Loans, it could not *actually* allocate any basis to those loans.

35. The effect of this was twofold: (i) first, BankUnited was forced to recognize its Section 597 Gain without owning corresponding assets with an equivalent increased basis, and (ii) second, BankUnited was left with $1.947 billion of basis that, although allocated to its Class II assets by operation of the Section 597 Regulations, could not be assigned to any of the acquired assets (such amount of basis, the "Section 597 Basis").

36. BankUnited ultimately recorded this Section 597 Basis in its own separate account for U.S. federal tax purposes.

37. For the reasons discussed below in paragraphs 52-56, this Section 597 Basis should be treated as a capitalized asset, which ultimately became deductible in the 2019 Tax Year when the associated FDIC Loss Guarantees were terminated.

## PROCEDURAL BACKGROUND AND CLAIM FOR REFUND

38. The application of the Section 597 Regulations to the BUFSB Acquisition resulted in an imbalanced tax and economic outcome. BankUnited recognized $1.682 billion of phantom income with no clear means to recover the associated tax basis in the future.

39. When the IRS audited Plaintiff's 2009 tax year beginning in 2012, the IRS examined the BUFSB Acquisition, asking questions and requesting documents regarding the calculation of BankUnited's Section 597 Gain. However, the IRS did not make any adjustments to BankUnited's reported Section 597 Gain.

40. On May 20, 2015—six years after the BUFSB Acquisition— the Department of Treasury issued proposed regulations under Treas. Reg. § 1.597-3(a) establishing that an institution acquiring a failed bank that owned a REIT subsidiary should <u>not</u> be treated as the deemed owner of the REIT subsidiary's underlying loans. *See* 80 Fed. Reg. 28,872, 28,877 (May 20, 2015).

41. Consequently, in 2017 the IRS informed BankUnited that the company should not have treated itself as the deemed owner of the BU REIT Loans, and should not have allocated the $1.947 billion of basis associated with the BU REIT Loans to the Class II assets. Accordingly, the IRS determined that BankUnited over-reported in income the Section 597 Gain of $1.682 billion.

42. On November 29, 2018, the IRS examination team refunded the tax Plaintiff paid with respect to $842,942,471 of BankUnited's Section 597 Gain (the portion of the Section 597 Gain that BankUnited had reported in 2012, 2013, and 2014).

43. However, the IRS refused to reverse the remaining $839,388,263 of Section 597 Gain reported in 2009, 2010, and 2011 because the statute of limitations for Plaintiff to seek a refund from the IRS had expired.

44. At the beginning of Plaintiff's 2019 Tax Year, BankUnited still had $1.104 billion of Section 597 Basis remaining in its account.  The $1.104 billion of Section 597 Basis is calculated by subtracting the amount of Section 597 Gain previously refunded for tax years 2012, 2013, and 2014 ($842,942,471) from BankUnited's initial Section 597 Basis ($1.947 billion).

45. Plaintiff reported its income tax liability for the 2019 Tax Year without including a deduction related to the Section 597 Basis.

46. On or about March 30, 2022, Plaintiff filed the Refund Claim, demanding a refund of $39,797,526 of federal income tax paid for the 2019 Tax Year on the grounds that it was entitled to a deduction with respect to the remaining $1.104 billion of Section 597 Basis.

47. The Refund Claim is attached as Exhibit A. Each of the statements and contentions set forth in the Refund Claim is incorporated by reference.

48. No part of the refund Plaintiff requested in the Refund Claim with respect to the 2019 Tax Year has been credited, remitted, refunded, or repaid to Plaintiff, and more than six months have expired since Plaintiff filed the Refund Claim.

49. Plaintiff therefore now brings this action for recovery of $39,797,526 in federal income taxes, plus overpayment interest on the amounts to be refunded, or such greater amount as is legally refundable.

### *Count One*

50. Plaintiff incorporates herein by reference and realleges all allegations in paragraphs 1-49.

51. For the reasons set forth below in paragraphs 52-56, Plaintiff is entitled to recover from Defendant the amount of $39,797,526, plus overpayment interest, as allowed by law.

52. Here, the Section 597 Basis—an amount of basis that BankUnited was required to take into account during the BUFSB Acquisition that was not associated with an asset actually acquired in the acquisition—should be treated as its own capitalized asset. *See, e.g.*, *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79 (1992).

53. Independent capitalized assets, like the Section 597 Basis, become deductible under section 165 at the time the benefit that created that capitalized asset no longer exists. *See, e.g.*, *McCrory Corp. v. United States*, 651 F.2d 828 (2d Cir. 1981) (holding that a corporation's

capitalized expenses related to benefits it received from the acquisition of a specific line of business could be recovered once that particular line of business was sold or abandoned).

54. Here, the Section 597 Basis existed only because of the benefit provided to BankUnited by the FDIC Loss Guarantees: the FDIC Loss Guarantees were the reason BankUnited originally treated itself as the deemed owner of the BU REIT Loans and they were the reason BankUnited included the fair market value of those loans in its Class II assets. Without the FDIC Loss Guarantees, the Section 597 Basis would not have existed.

55. The benefit associated with the Section 597 Basis therefore ended on February 13, 2019 when the associated FDIC Loss Guarantees were terminated and the FDIC had ceased financially compensating BankUnited pursuant to those agreements.

56. Accordingly, the capitalized Section 597 Basis became recoverable in the 2019 tax year and Plaintiff was entitled to a deduction under section 165 in the amount of the remaining $1.104 billion of Section 597 Basis.

### *Count Two – Alternative Claim*

57. Plaintiff incorporates herein by reference and realleges all allegations in paragraphs 1-49.

58. Alternatively, the Section 597 Basis should be classified as a premium paid with respect to the BUFSB and BU REIT Loans (the "Section 597 Basis Premium"). *See Seaboard Fin. Co. v. Commissioner*, 23 T.C.M. (CCH) 1512 (1964) (holding that the premium paid on the acquisition of certain loans was eligible for amortization using an average recovery period); *W. Mortg. Corp. v. United States*, 308 F. Supp. 333, 341 (C.D. Cal. 1969) (holding that a purchaser of certain mortgage servicing rights could combine the amount paid for those rights and amortize those over the life of the loan).

59. Plaintiff has filed a protective corrective accounting method change on IRS Form 3115 to amortize the Section 597 Basis Premium over the 15-year period prescribed in Treas. Reg. § 1.167(a)-3, starting in 2009.

60. Thus, in the alternative, Plaintiff requests a section 481(a) adjustment in the 2019 Tax Year to account for the amortization deductions that should have been claimed for the Section 597 Basis Premium from 2009-2019.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

1. On the claim for relief in Count One, judgment in favor of Plaintiff against Defendant in the amount of $39,797,526 or such greater amount as the Court determines to be legally refundable, plus overpayment interest thereon as provided by law;

2. In the alternative, on the claim for relief in Count Two, judgment in favor of Plaintiff against Defendant in the amount of refund that Plaintiff would be entitled to if Plaintiff receives a section 481(a) adjustment in the 2019 Tax Year to account for the amortization deductions that should have been claimed for the Section 597 Basis Premium from 2009-2019; and

3. Plaintiff's costs of this action, and such other and further relief as this Court deems appropriate.

Respectfully submitted this 30 day of January, 2023.

GUNSTER
*Co-Counsel for Plaintiff*

By: /s/ *William K. Hill*
William K. Hill

        Florida Bar No.: 747180
        whill@gunster.com
        600 Brickell Avenue, Suite 3500
        Miami, Florida 33131
        Telephone: 305-376-6092

        Rajiv Madan*
        Nathan Wacker*
        Kevin R. Stults*
        Skadden, Arps, Slate, Meagher & Flom LLP
        1440 New York Avenue, NW
        Washington, DC 20005
        Telephone: (202) 371-7000
        Email: raj.madan@skadden.com
              nathan.wacker@skadden.com
              kevin.stults@skadden.com

        *Attorneys for Plaintiff, BankUnited Inc.*

*Pro hac vice application forthcoming.